**Randi M. WALKER, Plaintiff,**

v.

**PHILADELPHIA LIFE INSURANCE COMPANY, Defendant.**

**Civ. A. No. 654.**

United States District Court,
E. D. North Carolina, Raleigh Division.

Dec. 29, 1954.

Harris, Poe & Cheshire, Clem B. Holding, Raleigh, N. C., for plaintiff.

Smith, Leach, Anderson & Dorsett, Raleigh, N. C., for defendant.

GILLIAM, District Judge.

This case was heard by the Court and an advisory jury which could not agree on the issue submitted to it, and was discharged.

The plaintiff seeks to recover on a life insurance policy which is dated December 4, 1951; and the defendant defends upon two grounds: 1. The policy is voidable because of misrepresentation of material facts in the application; and 2. Because the insured died from a wound which was intentionally self-inflicted with a pistol. The latter question only was submitted to the jury.

The application, dated November 17, 1951, begins and ends as follows: (Beginning) "I hereby apply for insurance * * * and represent that the statements and answers in this Part I and those of the person proposed for insurance as they appear in Part II of this application, by whomsoever written, are full, complete and true, and agree that they are to be considered as the basis of any insurance issued hereon." * * * (End) "The undersigned represent that all statements and answers as written or printed in the foregoing application Part II, by whomsoever written, are full, complete and true, and agree that they are to be considered as the basis of any insurance issued hereon. Any physician or other person who has attended or been consulted by the person here examined is hereby authorized to disclose any information thus acquired."

In the body of the application, between the above statements, certain questions and answers appear:

"13. Q. Have you consulted a physician in the last five years? A. No.

"If so, give a full history below. (No answer.)

"14. Q. Are you now in good health? A. Yes.

"16. Q. Have you ever had or been advised to have any surgical operation? A. Yes.

"Give details. A. 1929, appendectomy.

"20. Q. Have you now or have you ever had * * * any other disease or injury? A. Yes.

"Give details, dates, etc., of any history noted above and obtain signed authorization. A. 1945, pituitary tumor, diagnosed at Duke Hospital. Took X-ray therapy and no trouble since.

"9. Q. What is the total amount of insurance on his (or her) life? A. Sec. Life, $15,000.; Accidental, $15,000."

I find that the answers to questions 13, 14, 16 and 20 were false and there is really no serious controversy in this regard. The applicant consulted Dr. Roger Wall, of Raleigh, N. C., fourteen times within the five-year period just before the date of the application. He first consulted Dr. Wall on October 4, 1948, at which time he was suffering with an eye infection or ulceration. The patient was discharged on November 13, 1948, after six visits. The next visit to Dr. Wall was on December 26, 1949, when the ulceration had recurred. This time the patient was discharged after three visits. The applicant again saw Dr. Wall on March 4, 1950, to have his eyes examined. Upon examination, it was found that his temporal vision was lost to the extent of about one-half in one eye and completely in the other. From this finding the doctor concluded that the patient had a brain tumor and so advised him, also advising that he consult a neuro-surgeon.

On March 17, 1950, he consulted Dr. Frank S. Walsh, a neuro-surgeon, of Baltimore, Maryland, and upon examination Dr. Walsh concluded that there was a recurrence of the pituitary tumor, for which he had had X-ray therapy at Duke Hospital in 1945. Dr. Walsh advised insured of his diagnosis and advised that he thought surgical removal of the tumor advisable. Dr. Walsh reported to Dr. Wall, whereupon the latter communicated with the applicant who advised that he was aware of the contents of Dr. Walsh's report and diagnosis.

In answer to question No. 9, insured answered that he had only $30,000. In outstanding life policies, whereas actually he had other policies not reported, that is, $10,000. with the Home Security Life and Trust Company, and a "reducing balance" policy with the Security Life and Trust Company, securing a mortgage on which insured then owed $9,-378.20. The answer, thus, was untrue. This is not denied.

So that, the answer to each question enumerated above was false and untrue. The defendant does not allege that the false representations were wilfully made to defraud or mislead it, and accordingly the Court makes no finding to this effect; though it does appear that applicant knew that his answers to questions 9, 13, 16 and 20 were not "full, complete and true" as represented by him in his application. Question 14, inquiring as to the condition of his health, called for only his opinion and, of course, in this answer he could have been honestly mistaken.

So we have the question whether the representations were "material or fraudulent" so as "to prevent a recovery on the policy". To me the materiality of the representations appears plain, but counsel for plaintiff press upon me vigorously their views to the contrary.

N.C.G.S. § 58–30 reads: "All statements or descriptions in any application for a policy of insurance, * * * shall be deemed representations and not warranties, and a representation, unless material or fraudulent, will not prevent a recovery on the policy." Clearly a rep-

resentation which is material and false will prevent recovery, even though not fraudulent. The North Carolina cases declare the rule to be that "the materiality of the representation depends on whether it was such as would naturally and reasonably have influenced the insurance company with respect to the contract or risk". Carroll v. Carolina Casualty Insurance Company, 227 N.C. 456, 458, 42 S.E.2d 607, 608. In this case the Court said a jury question was presented, but in Equitable Life Assurance Society v. Ashby, 215 N.C. 280, 283, 1 S.E.2d 830, 832, Justice Barnhill (now Chief Justice), declared: "The representations made were material to the risk. They are in the form of written answers made to written questions. In such case the questions and answers are deemed to be material by the acts of the parties to the contract"; and in Petty v. Pacific Mutual Life Insurance Company, 212 N.C. 157, 160, 193 S.E. 228, 230, Justice Winborne wrote: "It is settled law in North Carolina that answers to specific questions like the one asked in the instant case, where there had been medical examination, are material as a matter of law." The question asked there was: " 'Have you during the past year had any injury, sickness or ailment of any kind, or required the services of a physician or any other practitioner?' "

But whether it be an issue of fact or question of law, the result will be the same, that is, that the answers to questions 9, 13, 16 and 20 were material, and being also false, the contract of insurance is vitiated and there can be no recovery.

Let us examine the answer to question 20—Have you ever had or been advised to have any surgical operation? Give details. Answer: Yes, 1929 appendectomy. The answer was not full and complete, because, as a matter of fact, in March, 1950, he was advised by an eminent Baltimore neuro-surgeon that he had a brain tumor and that a surgical operation was advisable. How can it be seriously argued that knowledge of this fact would not have influenced the defendant with respect to the contract or risk? The Court may take judicial notice of the fact that a condition indicating an operation for removal of a brain tumor substantially affects the risk of insuring the life.

The plaintiff's counsel points out that there was no "evidence of the defendant's policy or the policy of other companies in regard to accepting or rejecting risks under conditions similar to the case involved", and this is true; but such evidence is not needed, as the answer is obvious.

Plaintiff's counsel also rely on the testimony of Wardlaw, the agent who took the application and wrote the answers, and argue as follows: "Wardlaw, as agent for the Company, put down what he thought ought to be put down for the information of the Company, his principal. It is conceded that there were omissions. However, imputing the agent's knowledge to the principal—particularly when agent himself asked the pertinent questions, discussed the problems, and himself wrote the application —there was nothing withheld that would materially and reasonably influence the defendant not to write the policy. In addition, under the particular circumstances of this case, Wardlaw certainly knew better than insured what information should go on the application for the benefit of the Company". There are two flaws, in my opinion, in this argument. In the first place, it does not appear from the evidence that the agent was fully advised about Dr. Wall's or Dr. Walsh's diagnosis; and in the second place, had he been, his knowledge will not be imputed to or bind the Company. In Fountain and Herrington v. Mutual Life Ins. Co., 4 Cir., 55 F.2d 120, 123, the Court of Appeals of this Circuit held as follows: "The answer to this is that notice to an agent is notice to the principal only as to matters lying within the scope of the agent's authority; and the agent here had no authority to pass upon risks, accept any representations or informa-

tion not contained in the application, or waive forfeitures". This is the North Carolina rule as announced in Thomas Yelverton Co. v. State Capital Insurance Co., 238 N.C. 278, 77 S.E.2d 692, and other cases.

Another argument made by plaintiffs is that defendant is estopped from asserting its rights or has waived its rights by failing to take action to cancel the policy during applicant's life. Conceding that there could be a case in which an insurance company might be held to have waived its rights by continuing to accept premiums after being fully informed of false representations in the application, but we have no such case here. Counsel call attention to the evidence that defendant's investigator appeared at Dr. Wall's office armed with an authorization from plaintiff on the day of applicant's death. While it follows from this that by then the Company had come by information that applicant had consulted Dr. Wall, it does not follow that defendant "knew it all the time" as plaintiff's counsel assert. It does not appear what information the Company had or when it was received. So far as we know, the investigation was being conducted for the purpose of a suit to cancel the policy. The burden here is imposed upon plaintiff and the principle of waiver and estoppel does not come into play unless it clearly appears that the party sought to be held to it acted with knowledge of the facts upon which it is based.

The first defense is upheld and this finding would dispose of the case in defendant's favor, but I will also consider the second defense, that the pistol wound which caused applicant's death was intentionally self-inflicted. With deference and respect for the views and opinion of plaintiff's zealous counsel, and despite some measure of reluctance, I am persuaded that the firing of the pistol was not accidental, and, therefore, was a deliberate act on the part of the deceased. It is true under the law that, such an act being unnatural, there is a presumption against it, which is rebuttable and usually must be rebutted by circumstantial evidence. Some cases even hold that the evidence must remove all reasonable doubt. Applying this rule for the quantum of proof, my conclusion is as above expressed.

There are several circumstances established by the evidence which tend strongly to lend logic to the conclusion reached; such as, the applicant was heavily insured for a person in his circumstances, his business at best had not been profitable, (shortly before his death he sought to swap $1,000 checks with an acquaintance) and he knew he was suffering from a brain tumor. But attaching a minimum of weight to such circumstances, even eliminating them from consideration altogether, there can be only one reasonable conclusion, as I view the evidence. I will not attempt to demonstrate the soundness of my conclusion, but I feel certain that the death was not accidental. Though counsel insist that it was, they have not so much as suggested the manner in which the wound might have been so inflicted. The undisputed facts rule it out completely.

Plaintiff's counsel content themselves with referring to certain bizarre facts, and admittedly there are several, such as the deceased's naturally jovial disposition, his light and good humor the night before, his having mapped out plans and itineraries for the next few days with his son, his taking a shower and shaving, and packing his bag just before the shot was heard, and leaving his bedroom door open, but the fact remains—the evidence shows that the death was not accidental.

Having so found the facts and reached the conclusions set out, a judgment will be entered dismissing the action with costs to the defendant.